# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4425-18T3

C.C.,[1]

       Plaintiff-Respondent,

v.

J.A.H.,

       Defendant-Appellant.

---

> APPROVED FOR PUBLICATION
>
> **May 4, 2020**
>
> APPELLATE DIVISION

Submitted March 31, 2020 – Decided May 4, 2020

Before Judges Accurso, Gilson and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FV-04-2424-19.

J.A.H., appellant pro se.

Respondent has not filed a brief.

The opinion of the court was delivered by

ROSE, J.A.D.

In this case of first impression, we examine the meaning of a "dating relationship" under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-

---

[1] We use initials to protect the confidentiality of the victim. R. 1:38-3(d)(10).

17 to -35, where the parties never experienced a traditional, in-person "date." Instead, their relationship was demonstrated by the intensity and content of their communications, including the exchange of nearly 1300 highly personal text messages. We conclude the proliferate and exceedingly intimate communications between the parties constituted a dating relationship within the meaning of the Act and supported entry of the final restraining order (FRO). We therefore affirm.

I.

The facts were established at the two-day bench trial, during which both parties were represented by counsel. The evidence was largely based on plaintiff C.C.'s testimony and the compilation of the parties' text messages that was admitted over the objection of defendant J.A.H.[2]

In the mid-summer of 2018, the parties met at a fitness center where plaintiff was employed as the general manager and defendant was a new member. Defendant had transferred his membership to that location when he moved to the area from Pennsylvania. Nearly every time he exercised at the

---

[2] Due to the amount of text messages, plaintiff's counsel converted the messages to a chart format utilizing an unspecified application. During formatting, apostrophes and emojis were converted to non-alphanumeric symbols, but the messages were readily decipherable.

A-4425-18T3

gym – about three to five times per week – defendant sought plaintiff's attention, engaging her in intimate conversations about her personal life. Plaintiff was twenty-two years old; defendant was almost twenty years her senior.

At some point, defendant gave plaintiff his cellphone number, but plaintiff did not text him until the end of September. During the ensuing five weeks, the parties exchanged text messages at all hours of the day and night. Many of the messages were sexually explicit and suggestive in nature. The parties discussed in graphic detail: their sexual preferences; their prior dating experiences; their recreational drug and alcohol use; and the traits they desired in a partner. Plaintiff testified about a sampling of the text messages.

On October 20, defendant sent plaintiff a message, apparently declaring his romantic interest in her:

> I think the fact that I put in work for literally several months should give you a clue and that I wasn't some older dude giving you my number just to hit. I don't think I've ever waited so long in my entire life. And, yeah, I know you keep your walls up, hence why I let you call the shots and come around to me all while you were doing your thing with other dudes. But I mean if you want to just be friends, that's on you, you're driving the bus, always have.

Later that day, defendant sent plaintiff a message stating, "you would/will be the youngest I've hooked up with." Plaintiff explained the phrase, "hooked

A-4425-18T3

up," meant an "[i]ntimate relationship, sex generally." Plaintiff did not discourage defendant's advances. Rather, the parties had several discussions about "meeting up," which plaintiff defined as getting together "[i]n person, outside of work, on a date."

On October 22, defendant cancelled their plans; the parties continued their discourse; four days later, plaintiff cancelled their date. Plaintiff testified she had other plans, but also "felt uncomfortable meeting up with him outside of work." Apparently, plaintiff did not share her feelings with defendant.

The following day, the parties exchanged more than thirty text messages. Plaintiff explained some of the messages, which she characterized as "flirting." For example, defendant sent a message that read:

> Look, neither one of us is good with the feeling shit, right? You act confused and I act like someone who I'm not. The lame texts I send to put in work make me look soft, and that's not me, and I hate it, but think you also hate it, too, so let's cut through the chase and fuck not tonight but soon.

Plaintiff said she believed that message meant the parties should "just meet up and continue along th[e] line of a relationship." But, the parties did not meet outside the gym.

By November 1, the parties had exchanged 1097 text messages and continued to speak in person at the gym. On November 4 – after plaintiff sent

defendant messages indicating she no longer "s[aw] the need for further communication" other than "as a friend" – the tenor of defendant's messages changed completely. What followed can only be described as a barrage of six rapid-fire messages from 11:37 p.m. to slightly before midnight, followed by several lengthy messages from 12:23 a.m. to mid-afternoon on November 5. Many of the messages contained vulgar, insulting, and threatening language, the details of which we need not recount here.

In essence, defendant threatened to contact plaintiff's employer in an effort to have her fired for taking – what he belatedly claimed was – an unauthorized photograph of him at the gym. Defendant also threatened to institute a civil lawsuit against plaintiff, knowing her finances prevented her from hiring counsel to defend it. In one particularly notable example, defendant wrote, "you really don't know who I am which is so shocking because I thought you would have known by now."

After awakening and reading defendant's barrage of harassing messages on November 5, plaintiff conducted an internet search of defendant's name. Among other things, plaintiff discovered defendant had been convicted of stalking and harassing a woman he dated in Pennsylvania. Plaintiff introduced in evidence the unreported decision of a Pennsylvania appellate court, affirming

5

defendant's convictions in that matter. According to plaintiff, certain facts of that case bore striking similarities to her own. For example, someone attempted to access plaintiff's cellphone account without authorization after she ended her relationship with defendant, which happened to the woman in the Pennsylvania case as well.

That same morning, plaintiff reported the incident to the local police and her employer, who terminated defendant's gym membership. In doing so, plaintiff discovered someone had accessed defendant's electronic membership account earlier that morning and changed his address on file to her home address. At some point, the detective assigned to her case advised plaintiff to seek a restraining order. On November 17, plaintiff filed her initial complaint, upon which a TRO was granted that same day by a municipal court judge. A criminal complaint also was filed against defendant on that day.[3]

Apparently, the TRO was dissolved in December when the court was unable to contact plaintiff to appear for an FRO hearing. Plaintiff testified she had not received any notices to appear in court and was unaware the matter had

---

[3] The criminal complaint charged defendant with fourth-degree harassment, N.J.S.A. 2C:33-4(e), alleging he was serving a probationary term for a stalking felony conviction in the Pennsylvania matter. The disposition of that complaint is not contained in the record.

been dismissed until March 17, 2019, when she ultimately learned defendant had been served with the TRO.[4] It is unclear from the record whether police advised plaintiff they were unable to serve defendant until that date. The following day, plaintiff sought a second TRO, alleging the same claims as in her initial TRO. On April 15, plaintiff amended her complaint and TRO to include additional allegations of harassment that allegedly occurred between November 2018 and a "few weeks" prior to her amended pleadings.[5]

Defendant did not testify at the hearing. He moved to dismiss the complaint and dissolve the TRO, arguing plaintiff failed to establish the parties had been involved in a dating relationship. The trial judge denied the motion, finding the "peculiar set of facts" established a dating relationship. The judge concluded defendant had committed harassment, N.J.S.A. 2C:33-4, a predicate

---

[4] According to the detective, local police were unable to locate defendant. Apparently, United States Marshal's officers apprehended defendant in Pennsylvania. Defendant was extradited to New Jersey and served with the TRO while in custody in the county jail. The record does not reveal how the TRO – which had been dissolved in December – was still in effect when defendant was served in March, but defendant does not challenge service on appeal.

[5] Plaintiff's additional allegations included the receipt of thousands of calls and text messages from anonymous numbers which referred to personal information she had revealed to defendant, and contacts from substance abuse rehabilitation facilities throughout the country in response to purported inquiries. The trial judge determined there was insufficient evidence to connect those allegations to defendant and did not consider them in issuing the FRO.

act of domestic violence under the Act, N.J.S.A. 2C:25-19(a)(13). The judge entered the FRO, and thereafter denied defendant's pro se motion for reconsideration. This appeal followed.

Representing himself, defendant appeals, maintaining: (1) the parties did not have a dating relationship; (2) an FRO is not needed to protect plaintiff; and (3) the plaintiff's documentary evidence was improperly admitted. Despite plaintiff's failure to file a response, we are not persuaded by any of defendant's arguments.

## II.

Our scope of review is limited when considering an FRO issued by the trial judge at the conclusion of a bench trial. We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are "specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples." J.D. v. M.D.F., 207 N.J. 458, 482 (2011). We will "not disturb the 'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" S.D. v. M.J.R., 415 N.J. Super. 417, 429 (App. Div. 2010) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). Despite

our deferential standard, a judge's purely legal decisions are subject to our de novo review. Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007).

It is well settled that to obtain an FRO under the Act, a plaintiff must not only demonstrate defendant has committed a predicate act of domestic violence as defined in N.J.S.A. 2C:25-19(a)(1) to (19), but also that a restraining order is necessary for his or her protection. J.D., 207 N.J. at 475-76 (citing Silver v. Silver, 387 N.J. Super. 112, 126-27 (App. Div. 2006)). Relevant here, the Act's definition of a "[v]ictim of domestic violence" includes "any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship." N.J.S.A. 2C:25-19(d). The term "dating relationship" is not, however, defined in the Act.

Where, as here, the nature of the parties' relationship is the pivotal prerequisite to acquiring jurisdiction under the Act, the trial judge should consider the factors identified in Andrews v. Rutherford, 363 N.J. Super. 252, 260 (Ch. Div. 2003), as adopted by our court in S.K. v. J.H., 426 N.J. Super. 230, 235 (App. Div. 2012). Those factors are:

> 1. Was there a minimal social interpersonal bonding of the parties over and above a mere casual fraternization?
>
> 2. How long did the alleged dating activities continue prior to the acts of domestic violence alleged?

3. What were the nature and frequency of the parties' interactions?

4. What were the parties' ongoing expectations with respect to the relationship, either individually or jointly?

5. Did the parties demonstrate an affirmation of their relationship before others by statement or conduct?

6. Are there any other reasons unique to the case that support or detract from a finding that a "dating relationship" exists?

[S.K., 426 N.J. Super. at 234 (quoting Andrews, 363 N.J. Super. at 260).]

None of the factors is determinative, however, and other factors may warrant consideration. J.S. v. J.F., 410 N.J. Super. 611, 614 (App. Div. 2009). This is so because "'[d]ating' is a loose concept undoubtedly defined differently by members of different socio-economic groups and from one generation to the next." Id. at 615-16. We therefore have cautioned against rigidly applying the Andrews factors, recommending trial judges "consider the parties' own understanding of their relationship as colored by socio-economic and generational influences." Ibid.

Moreover, when deciding whether the parties had a "dating relationship" the court must view the facts through the prism of the State's strong public policy against domestic violence. Id. at 614. "Indeed, the Act itself announces that its

10

purpose is 'to assure the victims of domestic violence the maximum protection from abuse the law can provide.'" Ibid. (quoting N.J.S.A. 2C:25-18). "These principles would not be served by a cramped interpretation of what constitutes a dating relationship." Ibid.

Against that legal backdrop, we turn to the relationship at issue, recognizing that other than their encounters at the gym, the parties never experienced a single in-person "date." They never visited each other's homes, or met each other's friends or family members. The parties never engaged in sexual relations, kissed, or even held hands. But, the absence of what might be viewed as traditional dating activities and affirmations does not render insignificant the proliferate and exceedingly intimate communications between the parties that underscored their relationship. Indeed, it is the nature and proliferation of those communications that constituted the parties' "dating activities" and transformed theirs into a "dating relationship."

In reaching his conclusion, the trial judge considered the Andrews factors and – what he deemed – the unique circumstances of this case. The judge found, at the very least, there was "minimal social interpersonal bonding" that extended beyond "mere casual fraternization," as evidenced by the exchange of nearly 1300 messages and frequent in-person contact at the gym. The judge cited

11

plaintiff's testimony that she believed the parties' interactions were "flirtatious." Noting the parties discussed "dating" and their "sexual history," the judge found "[t]he parties developed a very close relationship . . . ."  The judge elaborated:

> That level of communication between the parties is much more involved than one would imagine exists when . . . two people get together and go out to dinner on one or two occasions.  There is more in that communication tha[n] most parties . . . I would imagine [have] had if they dated for several weeks over several occasions, say once a week for five or six weeks.

We are satisfied the record contains sufficient credible evidence to support the judge's finding that the parties were involved in a dating relationship.  As recounted by plaintiff, the parties regularly engaged in intimate communications, evidenced by the plethora of sexually explicit text messages over the course of several months.  Plaintiff testified the relationship "started out" as a "friendship" then "progressed to an intimate level."  Toward the end of their relationship, defendant sent messages, stating:  "You feel things deeper than most and can't help but give your heart away . . . .  I see you and like who I see."  Thereafter, plaintiff acknowledged:  "[Y]ou've figured out much more about me then [sic] most people do . . . ."  Defendant also acknowledged his expectation that the parties intended to "hook up."

A-4425-18T3

The parties' relationship is distinguishable from the relationship in <u>S.K.</u>, where we concluded a single date did not constitute a dating relationship under the circumstances of that case. 426 N.J. Super. at 239. Even though an in-person "date" never materialized in this case, defendant's reliance on <u>S.K.</u> is misplaced. There, the parties never met before attending a large group vacation. <u>Id.</u> at 232. A few days into the trip, they socialized and danced at a bar. <u>Ibid.</u> The defendant walked plaintiff back to the hotel and attempted to kiss her, but the plaintiff rejected his advances. <u>Id.</u> at 233. In response, the defendant assaulted her, causing severe injuries. <u>Ibid.</u> We held, while the encounter at the bar "may have been sufficient to support a finding that the parties were on a 'date,' there was no evidence of anything more than th[at] single date and, thus, no evidence of the 'dating relationship' required by the Act." <u>Id.</u> at 232.

We did not, however, prescribe the number of dates that necessitate a dating relationship under the Act, or otherwise suggest the type of relationship at issue here would not fall within its protections. Here, the duration and extent of the parties' in-person and electronic communications far exceeded "the ongoing expectations" of the parties in <u>S.K.</u> <u>See id.</u> at 238. The only similarity between the cases is that the parties never engaged in a physical relationship. But unlike <u>S.K.</u>, the parties in the present matter knew each other for several

months, engaging in profoundly intimate conversations that occurred regularly in person at the gym and incessantly by text message.

We recognize plaintiff initially reported to the police that she "never intended to pursue anything with [defendant]." During her trial testimony, however, plaintiff explained when she made her report she "was scared and embarrassed because [she] didn't understand the entire situation until the morning" when she received defendant's string of overnight text messages. Acknowledging the parties' age differences and the sexually explicit nature of their communications, plaintiff explained she was "embarrass[ed] to think that everything revolving [sic] the situation would have led to a romantic relationship."

Plaintiff's embarrassment also explains the clandestine nature of the relationship, a factor that ordinarily might weigh against finding a dating relationship existed. See Andrews, 363 N.J. Super. at 260 n.3 (recognizing "the potential that individuals could be in a 'secret' dating relationship, [where] the parties intentionally go out of their way not to hold themselves out as a dating couple, in which case the other factors would logically carry more weight"). And, defendant's romantic expectations regarding the relationship, see id. at 260,

were evidenced – at the very least – by his intense reaction after he was spurned by plaintiff.

Finally, although we agree with the trial judge that the parties' dating relationship was "peculiar" because they never experienced an in-person date, we also acknowledge the prevalence of virtual communications in the ever-changing world.[6] Text messaging and other forms of electronic communication enable rapid yet deep interactions at all hours. Those communications can form bonds that may be no less intimate than sharing a dinner or movie. Nor is the lack of sexual relations dispositive. Because we have recognized "dating is a loose concept" that changes "from one generation to the next," J.S., 410 N.J. Super. at 616, the volume and intensity of text message communications can establish a dating relationship, even in the absence of a traditional in-person date. Cf. State v. Hubbard, 222 N.J. 249, 276 (2015) (Albin, J., concurring) (noting in the Fourth Amendment context, "[t]he law must adapt to technological advances"). We are satisfied the evidence supports the trial judge's

---

[6] We need look no further than the impact of the COVID-19 pandemic on the inability to meet in-person on traditional "dates." Instead, many people access internet websites and applications to "meet," sustain, and develop relationships virtually. See Abram Brown, Coronavirus Is Changing Online Dating – Permanently, Forbes (Apr. 5, 2020), https://www.forbes.com/sites/abrambrown/2020/04/05/coronavirus-is-changingonline-dating-permanently/.

determination that the parties had engaged in a dating relationship, and therefore plaintiff was a "victim of domestic violence" as that term is defined in N.J.S.A. 2C:25-19(d).

### III.

Turning to defendant's final points, we note he does not expressly argue the evidence failed to establish the predicate act of harassment. To the extent defendant suggests those messages were merely "[v]ulgar name-calling" and, as such, did not constitute harassment pursuant to our decision in R.G. v. R.G., 449 N.J. Super. 208, 226 (App. Div. 2017), his argument is misplaced. Although we recognized in R.G. that vulgar communication "alone is not domestic violence[,]" we also observed, "[a] fundamental element making a communication criminal harassment is the purpose to harass." Ibid. Contrary to defendant's passing argument otherwise, the trial judge expressly determined defendant's conduct was "purposeful." We are also satisfied defendant's threatening and insulting text messages far exceeded mere vulgar name-calling.

Although the judge's determination of the predicate act is not otherwise challenged by defendant, we note the judge did not specify the section of N.J.S.A. 2C:33-4 defendant violated. In our view, defendant's incessant text messages, which were sent on the heels of plaintiff's message ending the parties'

16

"intimate" relationship, established defendant "[e]ngage[d] in [a] course of alarming conduct" with the "purpose to alarm or seriously annoy [plaintiff]" under N.J.S.A. 2C:33-4(c).

Seemingly, the thrust of defendant's argument is that – even if he committed an act of harassment – an FRO was not required to protect plaintiff. To support his argument, defendant contends there was no history of domestic violence between the parties, and four months had elapsed between the parties' last contact and the entry of the temporary restraining order (TRO). Defendant's contentions are unavailing.

We recognize a history of domestic violence is one of six non-exhaustive factors judges must consider when evaluating whether an FRO is necessary for a plaintiff's protection, see N.J.SA. 2C:25-29(a),[7] but the judge was "not

_____

[7] Under N.J.S.A. 2C:25-29(a), trial judges "shall consider" but are not limited by the following factors:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;

obligated to find a past history of abuse before determining that an act of domestic violence ha[d] been committed," Cesare, 154 N.J. at 402. "A single act can constitute domestic violence for the purpose of the issuance of an FRO," even without a history of domestic violence. See McGowan v. O'Rourke, 391 N.J. Super. 502, 506 (App. Div. 2007) (holding that the defendant sending graphic pornographic pictures of plaintiff to her sister and then implying that he would also send them to others were egregious acts of harassment that justified entry of a final restraining order, even in the absence of any history of prior domestic violence). Likewise, the lack of domestic violence history between the parties was not dispositive in this matter.

Nor does the record support defendant's claim that plaintiff was dilatory in her request for a TRO. Plaintiff testified she was unaware the TRO had been dissolved – and defendant had not been served – until police notified her four months later. The day after police contacted her, plaintiff sought a second TRO,

---

(4) The best interests of the victim and any child;

(5) In determining custody and parenting time the protection of the victim's safety; and

(6) The existence of a verifiable order of protection from another jurisdiction.

and thereafter amended her complaint. In view of that procedural posture, we discern no unreasonable delay by plaintiff that would suggest an FRO was unnecessary for her protection.

We also reject defendant's challenges to the trial judge's evidentiary decisions, which are entitled to our judicial deference. State v. Cole, 229 N.J. 430, 449 (2017). We note the judge specifically determined the Pennsylvania decision was not introduced to demonstrate defendant was "a bad guy." Instead, the judge found the decision was probative of whether plaintiff "fears" defendant. Because the statements contained in the Pennsylvania decision were offered "not for the truthfulness of their contents, but only to show that they were in fact made and that the listener took certain action as a result thereof," the judge correctly determined those statements were not "inadmissible hearsay." James v. Ruiz, 440 N.J. Super. 45, 59 (App. Div. 2015). According to plaintiff, the information contained in the Pennsylvania decision indeed frightened her and provided the impetus for reporting defendant's harassing text messages to the police.

We further observe plaintiff disclosed she feared defendant had "somehow found out where [she] lived after making indications of some further action" in his harassing text messages. The screenshot of defendant's account on

19

November 5, which depicts plaintiff's home address under the field for defendant's address, was properly authenticated by plaintiff's testimony pursuant to N.J.R.E. 901 and provided another reason substantiating plaintiff's fear of defendant.

Even if the judge erred in admitting any of plaintiff's exhibits, however, the error was harmless. See R. 2:10-2. The exhibits merely corroborated plaintiff's unrefuted testimony.

In sum, although plaintiff could not prove the continuing anonymous messages that were alleged in her April 15 amended domestic violence complaint were sent by defendant, the trial judge found plaintiff's testimony established the totality of defendant's conduct placed her in fear. We are satisfied the credible evidence in the record supports the judge's decision that the FRO was necessary to protect plaintiff from immediate danger or future abuse. See N.J.S.A. 2C:25-29(b); Silver, 387 N.J. Super. at 127.

To the extent not addressed, defendant's remaining arguments lack sufficient merit to warrant discussion in our written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4425-18T3