# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3610-20

M.R-T.,

    Plaintiff-Respondent,

v.

J.R.,

    Defendant-Appellant.

_____

Argued July 19, 2022 – Decided August 8, 2022

Before Judges Gilson and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FV-15-1894-21.

Matthew W. Reisig argued the cause for appellant (Reisig Criminal Defense & DWI Law, LLC, attorneys; Matthew W. Reisig, on the brief).

M.R-T., respondent pro se.

PER CURIAM

    Defendant J.R. appeals from a final restraining order (FRO) entered under

the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25-17 to -35,

based on the predicate act of harassment, N.J.S.A. 2C:33-4. The trial court found that defendant had harassed plaintiff M.R-T. and that there was a need for an FRO to protect plaintiff's safety. We affirm because the trial court's factual findings are supported by substantial credible evidence, and it correctly applied the law.[1]

I.

We discern the facts from the record developed at a one-day trial conducted on June 29, 2021. At trial, the parties represented themselves, both testified, and neither called any witnesses. The parties were in a dating relationship that began in the mid-1990s. Although the dating relationship ended in approximately 1999, the parties continued to see each other, and they continued to have a sexual relationship until 2010.

The incident that gave rise to the request for a restraining order occurred on June 5 to June 6, 2021. Plaintiff testified that in April 2021, defendant sent her an email asking her to call him. She did not respond. In May 2021, defendant came to plaintiff's house at least once. During that occasion, defendant had looked into plaintiff's home while wearing a mask. Plaintiff

---

[1] We use initials to protect the confidentiality of the participants in these proceedings. R. 1:38-3(d)(10).

A-3610-20

explained that she recognized defendant and saw that defendant's car was parked outside her home. In addition, evidence indicated that plaintiff told defendant in May 2021 not to come to her house.

On June 5, 2021, defendant sent plaintiff an email requesting to speak to her. Plaintiff did not respond at that time. At approximately 2:30 a.m. on June 6, 2021, plaintiff was awakened when rocks were thrown against her window. She looked out and saw defendant's car outside her home. The lights on defendant's car were on and he was playing music loudly. A neighbor called the police, but defendant left before the police arrived. Although plaintiff did not have any direct contact with defendant on June 5 or June 6, 2021, she testified that she felt that defendant was there to demonstrate that he could come to her home whenever he wanted. In the afternoon on June 6, plaintiff replied to defendant's June 5 email stating that she knew defendant had been at her house earlier that day and she did not want to have any contact with him.

Defendant denied going to plaintiff's home on June 5 or June 6, 2021. He acknowledged that he had gone to her home in May 2021 but claimed that he was there to try to get the spare key to a car he was attempting to sell.

Addressing their history, plaintiff testified that while they were seeing each other, defendant had choked her, slapped her, and had thrown things at her.

3

In explaining her fear of defendant, plaintiff referenced an incident in 2015. At that time, plaintiff arranged to have a vehicle, which she had co-signed for defendant, picked up because he was not paying the car insurance. In response, defendant had sent her several text messages and a voicemail asking for the vehicle and saying he would come to her house to pick it up. Plaintiff told defendant to stop calling and texting her and not to come to her house. Thereafter, defendant sent plaintiff a message stating: "I'm on my way. I f[ ]ing told you to drop off the truck. Because of you I didn't get to see my daughter. Now, you're going to f[ ]ing pay for it."

When questioned about their history, defendant testified that he never choked, slapped, or threw things at plaintiff. He also explained that the text message he sent in 2015 concerned a truck that he claimed plaintiff had taken from him, and he was trying to get the truck back.

After listening to the testimony of the parties, the trial judge made credibility and factual findings. The judge found that plaintiff was more credible than defendant. Based on plaintiff's testimony, the judge found that defendant had come to plaintiff's home in the early morning hours of June 6, 2021, and that his purpose was to harass plaintiff. The judge also found that plaintiff was credible in explaining the history of domestic violence between the parties. In

4

that regard, the judge credited plaintiff's testimony that defendant had choked, slapped, and thrown things at her.

In addition, the judge also found that plaintiff needed an FRO for her safety. The judge reasoned that without a restraining order, defendant would continue to contact plaintiff and plaintiff needed the restraining order to keep her safe.

In contrast, the judge did not find defendant credible. She pointed out that defendant initially denied that he had choked, slapped, or threw things at plaintiff. Later, however, he testified that he could not remember doing those things and he denied that they happened because plaintiff never called the police. The judge found the inconsistency in defendant's testimony undercut his credibility.

After making findings of fact, the judge concluded that plaintiff needed an FRO and entered a restraining order. Defendant now appeals from the FRO.

II.

On appeal, defendant makes four arguments. He contends that the parties' relationship had been "dormant" for eleven years and, therefore, their prior dating relationship did not give the court jurisdiction under the Act. Second, defendant argues that he was deprived of due process because the trial court

allowed plaintiff to amend her complaint and testify about a prior history of physical domestic violence. Third, he argues that the trial court erred in finding that he had harassed plaintiff. Finally, he asserts that the trial court did not conduct the correct analysis required under Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006).

We reject those arguments. The judge made factual findings that there was jurisdiction under the Act and that plaintiff was a victim of domestic violence. The judge appropriately gave defendant the opportunity to adjourn the trial when she allowed plaintiff to amend her complaint to add allegations of physical abuse, but defendant elected to proceed with the trial without an adjournment. The judge also found that defendant had committed the predicate act of harassment. Finally, the judge made findings supporting the two prongs of the Silver test.

Our scope of review of the grant or denial of an FRO is limited. See C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). We accord substantial deference to family judges' findings of fact because of their special expertise in family matters. N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). That deference is particularly strong when the evidence is largely testimonial and rests on a court's

credibility findings. Gnall v. Gnall, 222 N.J. 414, 428 (2015). We will "not disturb the factual findings and legal conclusions of the trial [court] unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Balducci v. Cige, 456 N.J. Super. 219, 233 (App. Div. 2018) (alteration in original) (quoting In re Forfeiture of Pers. Weapons & Firearms Identification Card Belonging to F.M., 225 N.J. 487, 506 (2016)). "[W]e owe no deference to a trial court's interpretation of the law, and review issues of law de novo." Cumberland Farms, Inc. v. N.J. Dep't of Env't Prot., 447 N.J. Super. 423, 438 (App. Div. 2016).

The Act was passed to further New Jersey's "strong policy against domestic violence." N.T.B. v. D.D.B., 442 N.J. Super. 205, 216 (App. Div. 2015) (quoting Cesare, 154 N.J. at 400). Domestic violence occurs when an adult or emancipated minor commits one or more of the predicate acts identified by the Act. N.J.S.A. 2C:25-19(a). When determining whether to grant an FRO, a trial judge must engage in a two-step analysis. Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). "First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id.

at 125; see also N.J.S.A. 2C:25-29(a) (providing that an FRO may only be granted "after a finding or an admission is made that an act of domestic violence was committed"). Second, the court must determine that a restraining order is necessary to provide protection for the victim. Silver, 387 N.J. Super. at 126-27; see also J.D. v. M.D.F., 207 N.J. 458, 475-76 (2011) (explaining that an FRO should not be issued without a finding that relief is "necessary to prevent further abuse" (quoting N.J.S.A. 2C:25-29(b))).

A. Jurisdiction Under the Act.

Defendant argues that the parties' prior dating relationship did not qualify as a dating relationship under the Act because the parties had stopped dating more than ten years before the alleged harassment. Defendant then argues that the trial court failed to make specific findings supporting jurisdiction under the Act.

The Act defines a "[v]ictim of domestic violence" to include "any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship." N.J.S.A. 2C:25-19(d). The Act does not place a temporal limitation on when the dating relationship occurred. Nor does the Act expressly state that the dating relationship had to be active within a specified number of years of the alleged domestic violence.

8

Relying on a Chancery Division case, defendant argues that the Act does not apply to his relationship with plaintiff because they had stopped dating years before the alleged incident. See Sperling v. Teplitsky, 294 N.J. Super. 312, 321 (Ch. Div. 1996) (finding plaintiff was not a protected person under the Act because the alleged act of violence occurred following a five-year hiatus from the end of the dating relationship, with only one isolated incident of contact and no evidence of continuing violence or ongoing controlling behavior). We are not bound by the Chancery Division's opinion in Sperling. Moreover, the facts of Sperling are distinguishable from the facts here. In contrast to the parties in Sperling, who terminated their relationship after dating for approximately two years, plaintiff's and defendant's relationship lasted over fifteen years. The parties in Sperling had one isolated incident of contact whereas defendant repeatedly contacted plaintiff after the relationship ended. Defendant also came to plaintiff's home after she had told him not to come or contact her.

The passage of time from the end of a dating relationship is only one factor to be considered in determining whether plaintiff is protected under the Act. See Tribuzio v. Roder, 356 N.J. Super. 590, 597 (App. Div. 2003). We have identified six factors to help determine whether a plaintiff is a "victim of domestic violence" under the Act. See C.C., 463 N.J. Super. at 429 (adopting

9                                                                                    A-3610-20

factors identified in <u>Andrews v. Rutherford</u>, 363 N.J. Super. 252 (Ch. Div. 2003)). Those factors include the length of dating activities prior to the alleged acts of domestic violence and the nature and frequency of the parties' interactions. <u>See</u> <u>C.C.</u>, 463 N.J. Super. at 429 (quoting <u>S.K. v. J.H.</u>, 426 N.J. Super. 230, 235 (App. Div. 2012)). None of the six factors, however, is individually dispositive. <u>Ibid.</u> Indeed, we have cautioned against rigidly applying the factors because courts should "view the facts through the prism of the State's strong public policy against domestic violence." <u>Id.</u> at 430. The Act's purpose in affording victims of domestic violence the maximum protection from abuse would not be served by a "cramped interpretation of what constitutes a dating relationship." <u>Ibid.</u>

Here, plaintiff's testimony made it clear that defendant's ongoing contact with her arose out of their dating relationship. The parties had an ongoing relationship; they first dated and then saw each other for over fifteen years from the mid-1990s to 2010. Furthermore, the recent contacts by defendant arose out of that earlier relationship. Consequently, we see no reason to limit the protection of the Act given the factual findings made by the trial judge. We also reject defendant's argument that the trial judge failed to make a jurisdictional

finding. The judge's findings made it clear that she relied on the dating relationship as the jurisdictional fact for issuing the FRO.

B. Defendant's Due Process.

Defendant argues that he was deprived of his due process rights when the trial court allowed plaintiff to amend her complaint to add allegations of prior physical abuse. In that regard, defendant contends that he was not given an opportunity to prepare to address plaintiff's amended allegations. The record rebuts that argument.

Parties to a domestic violence action are entitled to certain procedural due process rights. J.D., 207 N.J. at 478. Our Supreme Court has explained that "ordinary due process protections apply in the domestic violence context, notwithstanding the shortened time frames for conducting a final hearing that are imposed by the statute." Ibid. (internal citations omitted). Thus, the Court has explained that "ensuring that defendants are not deprived of their due process rights [in a domestic violence matter] requires our trial courts to recognize both what those rights are and how they can be protected consistent with the protective goals of the Act." Id. at 479.

At trial, plaintiff testified that defendant had physically abused her when they were dating by choking, slapping, and throwing things at her. The trial

judge appropriately recognized that plaintiff's testimony went beyond the allegations in her domestic violence complaint. Accordingly, the judge asked defendant if he wanted an adjournment to prepare to respond to those new allegations. Defendant declined that opportunity for an adjournment and stated that he wanted to proceed with the trial. Consequently, defendant's due process rights were not violated.

## C. The Predicate Act of Harassment.

The harassment statute provides that a person commits harassment if, with purpose to harass another, he [or she]:

> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4(a) to (c).]

Defendant argues that the trial court failed to perform a proper legal analysis supporting the finding that defendant had committed the predicate act

of harassment. Because the judge made adequate factual findings and legal conclusions, we reject this argument.

In making her findings that defendant committed the predicate act of harassment, the judge expressly quoted from the harassment statute. The judge then made factual findings that defendant had harassed plaintiff. Specifically, the judge credited plaintiff's testimony that at approximately 2:30 a.m. on June 6, 2021, defendant had gone to plaintiff's home, thrown rocks against her window, and sat outside the home in his car playing music loudly. The judge also found that defendant had the purpose to harass plaintiff when he came to her home in the early morning hours, without an invitation, and in direct contradiction to plaintiff's request that he leave her alone and not come to her home. The judge's factual findings are supported by substantial credible evidence in the record. Moreover, we discern no error in the judge's application of those facts to the law.

Despite those findings, defendant asserts that plaintiff was inconsistent when she stated in an email to defendant that her neighbor saw him outside her house the morning of June 6 but testified at trial that she was the one who saw defendant and his car outside her house that morning. Defendant's argument

13

goes to a credibility issue, which the trial judge resolved when she found plaintiff to be the more credible witness.

D.  The <u>Silver</u> Analysis.

Finally, defendant contends that the trial court only performed one part of the <u>Silver</u> analysis and the analysis of the need for an FRO was "truncated" and "too little, too late."  In support of that argument, defendant points out that the alleged predicate act occurred on June 6, 2021, but plaintiff waited until June 22, 2021, before obtaining a temporary restraining order (TRO).

As already noted, <u>Silver</u> requires a trial court to engage in a two-step analysis to determine (1) whether a predicate act of domestic violence has been committed; and (2) that a restraining order is necessary to provide protection for the victim.  <u>Silver</u>, 387 N.J. Super. at 125-27.  The trial judge here engaged in the two-step analysis called for under <u>Silver</u>.  First, the judge found that plaintiff had proven by a preponderance of the evidence that defendant had committed the predicate act of harassment.  Second, the judge determined that plaintiff needed a restraining order to protect her from defendant.  Those findings are amply supported by substantial credible evidence.  We discern no error in the judge's <u>Silver</u> analysis.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

14