983 A.2d 1151 (2009)
410 N.J. Super. 611
J.S., Plaintiff-Respondent,
v.
J.F., Defendant-Appellant.
DOCKET NO. A-2552-08T2.
Superior Court of New Jersey, Appellate Division.
Submitted November 12, 2009.
Decided December 10, 2009.
Jack Venturi & Associates, New Brunswick, for appellant (Jennifer L. Marshall, on the brief).
Sánchez & Associates, for respondent (Stelio Papadopoulo, on the brief).
Before Judges AXELRAD, FISHER and ESPINOSA.
The opinion of the court was delivered by
FISHER, J.A.D.
Following a trial, the judge entered a final restraining order in favor of plaintiff J.S. pursuant to the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25-17 to -35, based on findings that the parties were in a dating relationship and defendant J.F. made terroristic threats and *1152 otherwise harassed plaintiff. In this appeal, defendant argues in part that plaintiff did not qualify as a victim of domestic violence because he paid for plaintiff's company. We reject defendant's arguments and affirm.
Plaintiff filed a domestic violence complaint and obtained a temporary restraining order on December 2, 2008. Eight days later, the judge conducted a final hearing and, at the hearing's conclusion, made findings and entered a final restraining order.
Defendant appealed, arguing that: the parties were not in a dating relationship; there was no evidence of harassment or terroristic threats; there was no need for a restraining order; and the judge erred by employing a preponderance-of-the-evidence standard of proof. We find no merit in any of these arguments.
The Act permits the entry of restraining orders in favor of victims of domestic violence. N.J.S.A. 2C:25-29. The Act defines a "victim of domestic violence" as including, among others, "any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship." N.J.S.A. 2C:25-19d. It does not, however, define what is meant by "a dating relationship." Instead, the Legislature has left it to the courts, in their day-to-day involvement with these matters, to determine what relationships might be properly characterized as dating relationships.
Our decisional law defining the scope of a dating relationship is essentially limited to a single opinion authored by a trial judge. In Andrews v. Rutherford, 363 N.J.Super. 252, 260, 832 A.2d 379 (Ch.Div. 2003), Judge Michael Hogan suggested various factors to be evaluated in defining what constitutes a dating relationship for purposes of the Act:
1. Was there a minimal social interpersonal bonding of the parties over and above a mere casual fraternization?
2. How long did the alleged dating activities continue prior to the acts of domestic violence alleged?
3. What were the nature and frequency of the parties' interactions?
4. What were the parties' ongoing expectations with respect to the relationship, either individually or jointly?
5. Did the parties demonstrate an affirmation of their relationship before others by statement or conduct?
6. Are there any other reasons unique to the case that support or detract from a finding that a "dating relationship" exists?
[Footnote omitted.]
Recognizing the difficulties in attempting to describe all the characteristics of a dating relationship, Judge Hogan concluded that "[w]hile none of these factors may be individually dispositive on the issue, one or more of the factors may be more or less relevant in any given case depending on the evidence presented." Ibid.
We do not view this case as an appropriate vehicle for approving or disapproving the test suggested by Andrews, or for determining whether all the factors listed in Andrews have relevance in defining what constitutes a dating relationship. There may, in fact, be other factors not mentioned in Andrews that warrant consideration. We do, however, agree with Andrews insofar as there it was held that the facts should be liberally construed in favor of finding a dating relationship, ibid., because the Act itself is to be liberally construed in favor of the legislative intent to eradicate domestic violence.[1] Stated *1153 another way, the Act embodies a strong public policy against domestic violence. Cesare v. Cesare, 154 N.J. 394, 400, 713 A.2d 390 (1998). Because the Act is remedial in nature, it has been liberally construed for the protection of victims of domestic violence. Ibid.; Tribuzio, supra, 356 N.J.Super. at 596, 813 A.2d 1210. Indeed, the Act itself announces that its purpose is "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18. These principles would not be served by a cramped interpretation of what constitutes a dating relationship.
In considering these principles, we observe that the matter at hand suggests application of a factor not previously considered by our courts. Here, defendant argues he was not in a dating relationship with plaintiff because their relationship was purely "professional"; that is, according to defendant's argument on appeal, their interactions occurred when defendant frequented local clubs where plaintiff worked as a dancer. As a result, he argues without any legal support that a paid escort does not meet the Act's definition of "a victim of domestic violence."
Considering the Act's intended broad scope, we reject the contention that a relationship which includes a payment of consideration for the other's time precludes the finding of a dating relationship. Indeed, an au pair or live-in housekeeper would undoubtedly qualify as a "person who is a present or former household member," N.J.S.A. 2C:25-19d, entitled to relief under the Act, even though that person might be a member of the household only because compensation has been paid for his or her presence. The fact that a person receives a monetary benefit from engaging in a relationship does not automatically disqualify that person from the Act's benefits.[2]
But, again, we do not resolve this matter through application of only the factors suggested by Andrews. Experience suggests that most claims of a dating relationship turn on what the particular parties would view as a "date." "Dating" is a loose concept undoubtedly defined differently by members of different socio-economic groups and from one generation to the next.[3] Accordingly, although Andrews suggests some useful factors, courts should vigilantly guard against a slavish adherence *1154 to any formula that does not consider the parties' own understanding of their relationship as colored by socio-economic and generational influences.[4]
Here, despite his attempts to disparage plaintiff by asserting their relationship was "professional," defendant testified that his tendering of money to plaintiff was meant "to help her out financially" and not necessarily in exchange for her time. Indeed, despite defendant's attempt to describe plaintiff as a paid escort during the examination conducted by his attorney,[5] the judge questioned whether these payments occurred "during the time you were dating" (emphasis added). Defendant responded in the affirmative without qualification. Certainly, defendant's agreement that he and plaintiff dated was highly relevant.
In addition, defendant's attempts to suggest a pejorative connotation to the relationship were often conflicting. For example, defendant initially asserted that he paid defendant to be his escort at Thanksgiving dinner at his parents' home. However, upon further examination by the judge, defendant admitted he did not pay plaintiff for her company on that occasion:
Q. Did you pay her to come to Thanksgiving dinner? Yes or no?
A. Yes.
Q. You paid her?
A. Yes.
Q. How much did you pay her?
A. Well, it  for the  it wasn't 
Q. For to  you said she was an escort for Thanksgiving dinner.
A. Right.
Q. Did you pay her to come to Thanksgiving dinner? Did you tell her I want you to be the escort for Thanksgiving dinner, and how much is it going to cost?
A. No.
Q. So you didn't pay her for the Thanksgiving dinner?
A. No.
In any event, the judge found credible plaintiff's description of her relationship with defendant. Plaintiff testified she and defendant
were boyfriend/girlfriend, I went to his house, he introduced me to his parents. We went out several times together. We spent weekends together.
The judge was certainly entitled to find from this testimony that the parties had a dating relationship that ended shortly before defendant's harassing and threatening communications that formed the basis for this domestic violence action.
There was also ample evidence from which the judge was entitled to find that defendant engaged in acts of domestic violence. In evidence were scores of text messages sent from defendant's cellphone to plaintiff's, in which he threatened physical harm to plaintiff[6] and her boyfriend,[7] and also threatened to bring about her removal from the country.[8] The judge's *1155 findings that defendant committed acts of domestic violence  in that these and defendant's other communications constituted terroristic threats or were otherwise acts of harassment  are supported by credible evidence and entitled to our deference. Cesare, supra, 154 N.J. at 411-12, 713 A.2d 390.
We lastly make brief mention of defendant's argument that the final restraining order should be vacated because the judge employed the preponderance-of-the-evidence standard of proof as required by the Act, N.J.S.A. 2C:25-29a, rather than the clear-and-convincing standard. In this regard, defendant relies solely upon a trial judge's unpublished decision, which held the Act unconstitutional for, among other things, permitting findings of domestic violence through application of the preponderance standard. We have since reversed that decision, concluding that the Legislature was not constitutionally required to impose a clear-and-convincing standard for the adjudication of domestic violence matters. Crespo v. Crespo, 408 N.J.Super. 25, 37-40, 972 A.2d 1169 (App. Div.), leave to appeal granted, 200 N.J. 468, 983 A.2d 196 (2009). We, thus, find no merit in the argument contained in defendant's Point V.
Defendant's other arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] Other than Andrews, those cases that have dealt with dating relationships have focused on the problem created when the alleged act of domestic violence occurred years after termination of the dating relationship. See Tribuzio v. Roder, 356 N.J.Super. 590, 594-98, 813 A.2d 1210 (App.Div.2003); Sperling v. Teplitsky, 294 N.J.Super. 312, 318-21, 683 A.2d 244 (Ch.Div.1996). See also M.A. v. E.A., 388 N.J.Super. 612, 618, 909 A.2d 1168 (App.Div.2006) (rejecting the contention that a person's sexual assaults of his stepdaughter over a course of time gave rise to a dating relationship within the meaning of the Act).
[2] Monetary consideration for engaging in the relationship would not be a disqualifying fact in the Andrews' calculus. It would only be a fact to be considered in examining Andrews' sixth suggested factor, i.e., it might be viewed as "detracting" from a finding of a dating relationship.
[3] Similarly, our Supreme Court has avoided erecting rigid parameters around what constitutes a family, recognizing that the law does not recognize "one correct family paradigm." Lewis v. Harris, 188 N.J. 415, 445, 908 A.2d 196 (2006) (quoting In re Adoption of a Child by J.M.G., 267 N.J.Super. 622, 625, 632 A.2d 550 (Ch.Div.1993)). No one "`particular model of family life' has monopoly on `family values'"; "`[t]hose qualities of family life on which society places a premium ... are unrelated to the particular form a family takes.'" Ibid. (quoting V.C. v. M.J.B., 163 N.J. 200, 232, 748 A.2d 539 (Long, J., concurring), cert. denied, 531 U.S. 926, 121 S.Ct. 302, 148 L.Ed.2d 243 (2000)).
[4] We are particularly concerned that a rigid application of the factors set forth in Andrews might exclude many teenage dating relationships from the Act's coverage. See Devon M. Largio, Note, Refining the Meaning and Application of "Dating Relationship" Language in Domestic Violence Statutes, 60 Vand. L.Rev. 939 (2007).
[5] Defendant was represented by counsel at trial; plaintiff was not.
[6] E.g., "You better find somebody that loves you, because nobody wants to help you as much as I want to hurt your life."
[7] E.g., "Tell your boyfriend to come over, I got lots of guns at my house."
[8] E.g., "If you go to court, you get deported not me[;] [i]n America you are just another... immigrant whore, loser[;] you should go back to Brazil."