In granting the State's motion to bar defense expert's testimony, the court found no evidence to suggest defendant's expert had "any experience, other than his opinion," with the particular photo retrieval system viewed by the victims, and noted that he had not previously testified as an expert in this particular area. Noting, further, that it was inappropriate for an expert to testify about the accuracy of identifications, the court ruled that jurors should use a common sense approach to understanding this evidence.

We have already determined that expert testimony was not necessary to establish the reliability of the procedure employed in this case. Regardless, defendant fails to offer any specific legal authority in support of his argument or to provide facts of record to refute the court's finding that his expert was not qualified to testify about the particular identification procedure used. As such, there was no error in barring the defense expert's testimony.

[At the direction of the court, per *R.* 1:36-2(a), the discussion of other issues in this appeal has been omitted from the published version of the opinion.]

The matter is remanded for resentencing to reflect the appropriate merger and unmerger of offenses and to amend the judgment of conviction in accordance with this opinion. The judgment of conviction is affirmed in all other respects.

43 A.3d 1248

S.K., PLAINTIFF–RESPONDENT, v. J.H.,
DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 17, 2012—Decided June 6, 2012.

Before Judges FISHER, NUGENT and CARCHMAN.[1]

*Steven Kropf* argued the cause for appellant (*Heilbrunn Pape, LLC,* attorneys; *Mr. Kropf,* of counsel and on the brief).

*S.K.* argued the cause pro se.

The opinion of the court was delivered by

FISHER, P.J.A.D.

In this appeal, defendant argues the evidence did not support the trial judge's finding that when defendant atrociously assaulted plaintiff, while both were on a trip to Israel with dozens of others, the parties were in a "dating relationship" within the meaning of the Prevention of Domestic Violence Act (the Act), *N.J.S.A.* 2C:25–17 to –35. Although plaintiff's unrebutted testimony—that, one evening, she and defendant sat together, danced together, and were together for a few hours at the bar—may have been sufficient to support a finding that the parties were on a "date," there was no evidence of anything more than this single date and, thus, no evidence of the "dating relationship" required by the Act. We, therefore, reverse.

To obtain a final restraining order pursuant to the Act, a plaintiff must prove, by a preponderance of the evidence that: he or she is a "victim of domestic violence," *N.J.S.A.* 2C:25–19(d); the defendant committed a predicate act, *N.J.S.A.* 2C:25–19(a); and a restraining order "is necessary . . . to protect the victim from an immediate danger or to prevent further abuse," *Silver v. Silver,* 387 *N.J.Super.* 112, 127, 903 *A.*2d 446 (App.Div.2006) (citing *N.J.S.A.* 2C:25–29(b)).

---

[1] Judge Carchman did not participate in oral argument, but the parties have consented to his participation in the decision.

Here, only plaintiff testified at trial. Defendant did not attend the hearing and appeared only through counsel. The parties stipulated to the records relating to defendant's criminal prosecution in Israel. Plaintiff's unrebutted testimony and the stipulated documents demonstrated that plaintiff was on a trip to Israel with approximately forty others, including defendant. The parties had not met before the trip began. On May 31, 2010, a few days after arriving in Israel, plaintiff, defendant and others attended a group function. Later that night, or in the early morning hours of June 1, 2010, plaintiff, a female friend of plaintiff's, and defendant walked to plaintiff's room. The Jerusalem District Court's decision, which the parties stipulated into evidence, contains a finding that defendant then

> attempted to kiss [plaintiff] and she pushed him back and immediately entered her room. When she went out again, in order to walk to her friend's room and ask her to wake her up in the morning, she was noticed by [d]efendant, who ran towards her, jumped on her, for no reason, and began attacking her harshly, even after she had become unconscious. The [d]efendant did not stop until a resident of the place pulled him away from her and removed him from the place. As a result of the assault, [plaintiff] incurred severe bruises, broken orbit, fractures in jaw, tooth, cuts that required stitching and injury to the left lung.

Pursuant to a plea agreement, defendant admitted this conduct and was sentenced to an eight-and-one-half-month jail term, which was ordered to be served through community service with credit for defendant's incarceration for ten weeks following his arrest. Defendant was also ordered to pay plaintiff $57,000 in restitution.

These undisputed facts amply demonstrated the occurrence of a predicate act of such severity and viciousness that the need for a restraining order, as we said in *Silver, supra,* 387 *N.J.Super.* at 127, 903 *A.*2d 446, was "perfunctory and self-evident." The only matter in dispute was whether plaintiff could be said to be a "victim of domestic violence" as defined by *N.J.S.A.* 2C:25–19(d).

Not every person injured by another is entitled to the Act's protections. The term "victim of domestic violence" was originally limited to persons eighteen years of age or older, or emancipated minors, who were "subjected to domestic violence by a spouse, former spouse, or any other person who is a present or former

household member," as well as "a person with whom the victim has a child in common, or with whom the victim anticipates having a child in common, if one of the parties is pregnant." *Ibid.* Plaintiff fits none of these descriptions. The term "victim of domestic violence," however, was amended in 1994, *see L.* 1994, *c.* 93, § 1, to include "any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship." *Ibid.* Plaintiff asserted that her relationship to defendant met the requirements of this last description, and the trial judge agreed.

Unlike its counterparts in other states, our Legislature has not defined what it meant by a "date" or a "relationship" or by the words in tandem. Instead, the Legislature left it to the courts to ascertain the scope of this term. Even though the Act is remedial in nature and is to be liberally construed in favor of encompassing as many victims as reasonably permitted by the Act's language, *see Cesare v. Cesare,* 154 *N.J.* 394, 400, 713 *A.*2d 390 (1998); *J.S. v. J.F.,* 410 *N.J.Super.* 611, 614–15, 983 *A.*2d 1151 (App.Div.2009), we conclude that the evidence did not support the judge's finding of a dating relationship.

In 2003, one trial judge attempted to determine "what constitutes a 'dating relationship.' " *Andrews v. Rutherford,* 363 *N.J.Super.* 252, 253, 832 *A.*2d 379 (Ch.Div.2003). Based on common principles suggested by other state statutes, Judge Michael J. Hogan developed a six-question test for ascertaining the existence of a dating relationship:

1. Was there a minimal social interpersonal bonding of the parties over and above a mere casual fraternization?

2. How long did the alleged dating activities continue prior to the acts of domestic violence alleged?

3. What were the nature and frequency of the parties' interactions?

4. What were the parties' ongoing expectations with respect to the relationship, either individually or jointly?

5. Did the parties demonstrate an affirmation of their relationship before others by statement or conduct?

6. Are there any other reasons unique to the case that support or detract from a finding that a "dating relationship" exists?

[*Id.* at 260, 832 *A.*2d 379 (footnote omitted)]

We conclude that *Andrews* poses the appropriate questions to be considered when the existence of a dating relationship is disputed while recognizing that, if applicable, other factors unique to the parties should also be weighed. *Cf. J.S., supra,* 410 *N.J.Super.* at 614, 983 *A.*2d 1151.

We embrace the *Andrews* factors mainly because they appear consistent with the common themes developed by the great majority of other states' domestic violence laws.[2] We adopt this approach because there is no evidence that our Legislature intended to recognize as a dating relationship anything other than what those words might ordinarily connote. *See Nobrega v. Edison Glen Assocs.,* 167 *N.J.* 520, 536, 772 *A.*2d 368 (2001) (holding that, absent evidence of a contrary intention, the words of a statute should be given their ordinary meaning).

Although there are many variations in the domestic violence laws enacted in other states, those that have described the param-

---

[2] Not all states have included persons in dating relationships within the class of persons victimized by domestic violence. *See Fla. Stat. Ann.* § 741.28(3) (LexisNexis 2012); *Ga.Code Ann.* § 19–13–1 (2011); *Ky.Rev.Stat. Ann.* § 403.720(4) (LexisNexis 2012); *Md.Code Ann.,* Fam. Law § 4–501(m) (LexisNexis 2012); *Ohio Rev.Code Ann.* § 2919.25(F)(1) (LexisNexis 2012); *S.C.Code Ann.* § 16–25–10 (2011); *S.D. Codified Laws* § 25–10–1(2) (2012); *Utah Code Ann.* §§ 77–36–1(4), 78B–7–102(2) (LexisNexis 2012); *Va.Code Ann.* §§ 16.1–228, 18.2–57.2 (2012). Some states do not use the phrase "dating relationship" and may, in fact, through the use of different phrasing, intend something different than what other state legislatures meant by a "dating relationship." *See Ariz.Rev.Stat.* § 13–3601(A)(6) (LexisNexis 2012) ("romantic or sexual relationship"); *Colo.Rev.Stat.* § 12–36–135(1.5) (2011) ("intimate relationship"); *Iowa Code* § 236.2(2)(e) (2012) ("intimate relationship"); *Mont.Code Ann.* § 45–5–206(2)(b) (2011) ("dating or ongoing intimate relationship"); *N.H.Rev.Stat. Ann.* § 173–B:1(XV) (LexisNexis 2012) ("intimate partners"); *N.Y. Family Ct. Act* § 812(1)(e) (Consol.2012) ("intimate relationship"); *Or.Rev.Stat.* § 107.705(3)(e) (2011) ("sexually intimate relationship"); 23 *Pa. Cons.Stat.* § 6102(a) (2012) ("sexual or intimate partners"). These other terms are defined—when defined—in the same way other states define "dating relationship," although the words used suggest the importance of other facts not necessarily relevant to a finding of a "dating relationship."

eters of a dating relationship [3] have defined a date as a "social relationship of a romantic nature," [4] while excluding "a casual relationship or an ordinary fraternization between [two] individuals in a business or social context." [5] And many states, in describing the relationship required to invoke the protections of domestic violence laws emphasize, as relevant here, the frequency [6] and duration [7] of the parties' interpersonal associations. Until

[3] Like our Legislature, others have incorporated persons who are in a "dating relationship" as victims of domestic violence without defining that term. *See Ala.Code* §§ 15–10–3(b)(3), 30–6–1 (LexisNexis 2012); *Alaska Stat.* § 18.66.990(5)(C) (2012); *Conn. Gen.Stat.* §§ 46b–15(a), 46b–38a(2) (2012); *D.C.Code* § 16–1001(7)(C) (LexisNexis 2012); *N.M. Stat. Ann.* § 30–3–11(B) (LexisNexis 2012); *N.D. Cent.Code* § 14–07.1–01(4) (2012); *Tenn.Code Ann.* § 36–3–601(5)(C) (2012); *Wyo. Stat. Ann.* § 35–21–102(a)(iv)(H) (2012).

[4] *Vt. Stat. Ann.* tit. 15, § 1101(2) (2012); *see also Ark.Code Ann.* § 5–26–302(1) (2012); *Cal. Fam.Code* § 6210 (Deering 2012); *Haw.Rev.Stat. Ann.* § 586–1 (LexisNexis 2012); *Idaho Code Ann.* § 39–6303(2) (2012); *Kan. Stat. Ann.* § 60–3102(c) (2011); *La.Rev.Stat. Ann.* § 46:2151 (2012); *Mich. Comp. Laws Serv.* § 600.2950(30)(a) (LexisNexis 2012); *Miss.Code Ann.* § 93–21–3(d) (2012); *Mo. Rev.Stat.* § 455.010(7) (2012); *N.C. Gen.Stat.* § 50B–1(b)(6) (2012); *Tex. Fam. Code Ann.* § 71.0021(b),(c) (West 2012); *Wash. Rev.Code Ann.* § 26.50.010(3) (LexisNexis 2012); *Wis. Stat.* § 813.12 (2012).

[5] *Mich. Comp. Laws Serv.* § 600.2950(30)(a) (LexisNexis 2012); *see also Ark. Code Ann.* § 5–26–302(1)(B) (2012); *Del.Code Ann.* tit. 10, § 1041(2)(b) (2012); *Haw.Rev.Stat. Ann.* § 586–1 (LexisNexis 2012); 750 *Ill. Comp. Stat. Ann.* § 60/103(6) (LexisNexis 2012); *Miss.Code Ann.* § 93–21–3(d) (2012); *Neb.Rev. Stat. Ann.* § 42–903(3) (LexisNexis 2012); *Nev.Rev.Stat. Ann.* § 33.018(2) (LexisNexis 2012); *N.C. Gen.Stat.* § 50B–1(b)(6) (2012); *Okla. Stat.* tit. 22, § 60.1(5) (2012); *Tenn.Code Ann.* § 36–3–601(5)(C) (2012); *Tex. Fam.Code Ann.* § 71.0021(c) (West 2012); *W. Va.Code Ann.* § 48–27–204(4) (LexisNexis 2011); *Wis. Stat.* § 813.12 (2012).

[6] *Ark.Code Ann.* § 5–26–302(1)(A)(iii) (2012); *Cal. Fam.Code* § 6210 (Deering 2012); *Del.Code Ann.* tit. 10, § 1041(2)(b) (2012); *Idaho Code Ann.* § 39–6303(2)(c) (2012); *Ind.Code Ann.* § 35–42–2–1.3(c)(2) (LexisNexis 2012); *Iowa Code* § 236.2(2)(e)(1)(b) (2012); *Kan. Stat. Ann.* § 60–3102(c)(3) (2011); *La.Rev. Stat. Ann.* § 46:2151(B)(3) (2012); *Mass. Ann. Laws* ch. 209A, § 1(e)(3) (LexisNexis 2012); *Mich. Comp. Laws Serv.* § 600.2950(30)(a) (LexisNexis 2012); *Minn.Stat.* § 518B.01(b)(7) (2012); *Miss.Code Ann.* § 93–21–3(d)(iii) (2012); *Neb.Rev.Stat. Ann.* § 42–903(3) (LexisNexis 2012); *Nev.Rev.Stat. Ann.* § 33.018(2) (LexisNexis 2012); *R.I. Gen. Laws* § 8–8.1–1(3)(iii) (2012); *Tex.*

our Legislature provides greater insight, we will assume the Legislature intended a meaning similar to the majority of other states and, therefore, conclude that *Andrews* provides the appropriate outline for such determinations.[8] Certainly, if there was a legislative intent to create a broader definition of "dating relationship" than recognized in nearly every other state that includes the concept in its domestic violence laws, there would be some evidence to support it.

■  To be sure, the question posed is fact-sensitive. Here, the judge, in examining the facts in light of *Andrews*, found that the parties were on a "birthright trip" to Israel with forty other persons. The judge determined that the parties "hung out together,[9] within this group," and

on the night of . . . the incident, the defendant sat next to the plaintiff at dinner; although there was other available seating. He asked her what she was doing later

---

*Fam.Code Ann.* § 71.0021(b)(3) (West 2012); *Vt. Stat. Ann.* tit. 15, § 1101(2)(C) (2012); *Wash. Rev.Code Ann.* § 26.50.010(3)(c) (LexisNexis 2012); *Wis. Stat.* § 813.12 (2012).

[7] *Ark.Code Ann.* § 5–26–302(1)(A)(i) (2012); *Del.Code Ann.* tit. 10, § 1041(2)(b) (2012); *Idaho Code Ann.* § 39–6303(2)(b) (2012); *Ind.Code Ann.* § 35–42–2–1.3(c)(1) (LexisNexis 2012); *Kan. Stat. Ann.* § 60–3102(c)(2) (2011); *La.Rev.Stat. Ann.* § 46:2151(B)(1) (2012); *Mass. Ann. Laws* ch. 209A, § 1(e)(1) (LexisNexis 2012); *Minn.Stat.* § 518B.01(b)(7) (2012); *Miss.Code Ann.* § 93–21–3(d)(i) (2012); *N.C. Gen. Stat.* § 50B–1(b)(6) (2012); *R.I. Gen. Laws* § 8–8.1–1(3)(i) (2012); *Tex. Fam.Code Ann.* § 71.0021(b)(1) (West 2012); *Vt. Stat. Ann.* tit. 15, § 1101(2)(B) (2012); *Wash. Rev.Code Ann.* § 26.50.010(3)(a) (LexisNexis 2012); *Wis. Stat.* § 813.12 (2012).

[8] The Legislature has not reacted to *Andrews* in the nine years since it was decided; this silence provides "some indication" that *Andrews* properly interpreted the legislative intent. *Mani v. Mani*, 183 *N.J.* 70, 88, 869 *A.2d* 904 (2005); see also *Mass. Mut. Life Ins. Co. v. Manzo*, 122 *N.J.* 104, 116, 584 *A.2d* 190 (1991).

[9] The judge never explained what she meant when finding that the parties had "h[ung] out together." Moreover, plaintiff's testimony, upon which the judge relied, does not suggest the parties "dated" prior to the night in question; plaintiff suggested only that the parties may have conversed at times during the trip while in the company of others.

on that night, after dinner. They had, in fact, spoken throughout the dinner. And the plaintiff indicated that she would be hanging out at the bar with her friends, and the defendant asked to join them.

While at the bar, she danced with the defendant and he later walked, both she and her friend, to [her] room. Although his efforts to kiss her were rejected by the plaintiff, she believed that on the night of this incident, they were in fact on a date.[10]

This evidence might arguably suggest an affirmative response to the first *Andrews* factor: that during the night in question there was "interpersonal bonding of the parties over and above a mere casual fraternization." *Andrews, supra,* 363 *N.J.Super.* at 260, 832 *A.*2d 379. Although the evidence could have led to a contrary conclusion, the judge's finding that the parties were on "a date" during the evening in question is entitled to our deference because it is supported by evidence the judge found credible. *Cesare, supra,* 154 *N.J.* at 411–13, 713 *A.*2d 390 (holding that "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence" and recognizing that, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding"). But the evidence precludes an affirmative answer to any of the other six *Andrews* factors. Prior to the night in question, there was no "ongoing expectation[ ] with respect to the relationship," and the parties did not "demonstrate an affirmation of their relationship before others by statement or

10 Prior to oral argument, we granted defendant's motion to supplement the record with a statement given by plaintiff to Israeli investigating authorities on June 1, 2010. That report was not offered during the trial. Defendant has provided this statement to rebut plaintiff's testimony at trial that she believed she was on a date with defendant on the evening in question. We also permitted supplementation of the record to include plaintiff's opposing certification, in which she asserted that the June 1, 2010 statement: is incomplete; is unreliable because it was translated from English to Hebrew and back to English; that it is otherwise not accurate; that she was "groggy, confused and in great pain" at the time; and that the broken bones in her face and jaw, and her other injuries, caused her speech to be "slurred" and likely misunderstood. Upon further consideration, we have decided the issues on appeal without resort to the June 1, 2010 statement or plaintiff's opposing certification because they were not part of the trial record.

conduct." *Andrews, supra,* 363 *N.J.Super.* at 260, 832 *A.*2d 379.[11] In short, the parties' interaction on the evening in question, prior to the assault, may arguably be viewed as a date but there had been no previous dates and, thus, no "dating relationship." To take a more expansive view of the circumstances would lead to the unwarranted possibility that the Act would apply "where two people meet for a lunch date or date at the movies only on one occasion," or "where two individuals have a onetime casual lunch or 'dinner date.'" *Andrews, supra,* 363 *N.J.Super.* at 257, 832 *A.*2d 379.

To summarize, we hold that an interpretation of *N.J.S.A.* 2C:25–19(d) that would apply the Act to two persons who had a single date would give far too much weight to the word "dating" and too little weight to the word "relationship." If the Legislature intended to permit the Act's protections to apply to persons who had a single date, it would have defined "victim of domestic violence" as any person who has been subjected to domestic violence by a person whom the victim has dated.[12] By requiring evidence of a "dating relationship," the Legislature undoubtedly intended something of greater frequency or longer duration than a single date.

The order under review is reversed and the matter remanded for entry of an order dismissing the complaint.

---

[11] It is also noteworthy that the parties to this action never seem to have been alone at any point during the evening. Even when they left the gathering that evening, plaintiff and defendant were not alone but walked to plaintiff's room in the company of another. The record suggests that the parties were only alone together when defendant suddenly appeared and viciously assaulted plaintiff.

[12] Alaska describes one class of domestic violence victims as "adults or minors who are dating *or have dated,*" *Alaska Stat.* § 18.66.990 (2012) (emphasis added), and is, thus, the only state that might arguably permit the sufficiency of a single date as a ground for invoking the domestic violence laws.