# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1437-23

J.Z.,[1]

    Plaintiff-Appellant,

v.

K.M.,

    Defendant-Respondent.

_____

Submitted December 11, 2024 – Decided March 24, 2025

Before Judges Currier and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-0625-24.

Hovanec & Divito, LLC, attorney for appellant (Marisa Lepore Hovanec, of counsel and on the brief).

Respondent has not filed a brief.

PER CURIAM

---

[1] We use initials to protect the confidentiality of the victim in these proceedings. R. 1:38-3(d)(10).

Plaintiff, J.Z., appeals the November 30, 2023 order dismissing the Temporary Restraining Order (TRO) against defendant, K.M.[2] Discerning no abuse of discretion, we affirm.

A.

The following facts and procedural history are derived from the joint hearing record on cross TROs obtained first by K.M. against plaintiff and subsequently by J.Z. against K.M.[3] Both parties' complaints arose from the same events occurring on August 17, 2023 when K.M. picked up their then-three-year-old child at J.Z.'s parent's home, and August 18, when the parties attended the child's pediatrician appointment and clashed over who would take the child.

It is largely undisputed that the parties previously lived together and were engaged before their contentious relationship, marked by, as K.M. described, "serious fights," ended in May 2019. The two shared custody of their only child; and, in the absence of a formal parenting time schedule, informally agreed J.Z. would have the child weekly on Wednesday evenings and overnight Friday afternoon to Saturday evening.

---

[2] The court similarly dismissed the TRO defendant obtained against plaintiff, which defendant does not appeal.

[3] J.Z. obtained a TRO on September 6, 2023, which he later amended, alleging the predicate act of harassment arising out of these incidents.

A-1437-23

K.M. recounted the pertinent events as follows. On Thursday August 17, plaintiff texted defendant asking to take the child that night for a dinner with his family. She agreed to allow J.Z. to pick up their son from school but asked in exchange that she keep him Friday night to Saturday morning. She claimed J.Z. initially resisted, but later agreed.

Later that day, K.M. sent a text inquiring if she should pick up the child that night or if J.Z. was driving the child to her, and a dispute followed with J.Z. asking why he would agree to return the child if J.Z. was giving up the Friday night visit. In the text exchange, J.Z. indicated he was keeping the child Thursday night in exchange for Friday. After her attempts to arrange to pick up the child failed, K.M. and her mother drove to J.Z.'s parents' home where J.Z. resides to pick up the child. K.M. testified J.Z. came out screaming and cursing and refused to transfer the child, causing K.M. and her mother to leave without him.

K.M. recorded the incident[4] in which J.Z. is heard shouting at K.M. to "shut the f[***] up and stop acting . . . nice," and calling her a "c[***]." The argument continued concerning the parties' respective understandings of the

---

[4] The audio or video recordings were not provided on appeal; however, the content of any recordings played at trial was transcribed in the record.

A-1437-23

change in the parenting time schedule over the two days, with each calling the other "abusive," blaming each other for the demise of their relationship, and accusing each other of trying to alienate the child from the other.

K.M. indicated that she called the police who conducted a wellness check on the child the following morning finding no issue. K.M. had scheduled a doctor's appointment for the child on Friday, but J.Z. would not allow K.M. to pick the child up first and instead insisted that he bring their son and meet her at the appointment. K.M. went to the appointment with her parents and J.Z. and his mother brought the child to the office.

After the examination, K.M. recounted she needed to change the child's diaper and reached to take him from J.Z., when J.Z. hit her with his shoulder to block her from taking her son, causing her to fall into the reception desk. They then argued, and K.M. told her father to call the police as she stood by the door to block J.Z. from taking the child. K.M. indicated her mother tried to take the child, and J.Z. said if she touched the child, he would "slap the s[***] out of [her]."

When the police arrived, they attempted to calm the dispute. Lacking any court order, they allowed the child to go home with J.Z. The police recording of their encounter was played, revealing K.M. did not report that defendant had

"pushed" or assaulted her in any way. From there, K.M. obtained a TRO alleging J.Z. harassed and assaulted her.

K.M. described her past relationship with J.Z. during which they often "scream[ed] at each other," and J.Z., trained in mixed martial arts and boxing, tried to intimidate her with his large size, calling him "very strong." She explained he would get "very loud," "stand over [her]," and "yell at [her]," regularly using expletives like "c[***]" during arguments. She described a past incident when she was pregnant, and he threw her phone at her after she complained to J.Z. about the smell he created when he made "marijuana edibles" in their home. She described living with him as "walking on eggshells" as "his anger was explosive." She recalled an argument when he clenched his fists and threw "underwear" at her, and indicated she chose to leave rather than "risk [her] pregnancy." She related that on another occasion, J.Z. punched a hole in the wall, although she was not in the room at the time.

J.Z. described the events of August 17 and 18 differently. He believed their agreed-upon schedule change meant that he was to have the child overnight on Thursday in exchange for K.M. keeping him overnight on Friday. As such, when K.M. inquired about picking up the child on Thursday night, J.Z. refused in accordance with his prior understanding. He explained K.M. then called J.Z.'s

5

mother and arrived at the house confronting him and ruining the evening. J.Z. indicated that prior to activating the recording during the encounter, K.M. called him a "deadbeat dad," which she often does, acting "arrogant" and "cocky," as if she had an "edge over" him. He admitted he became angry after "hav[ing] to constantly fight for [his] son."

Regarding the next day, J.Z. recounted that after finishing with the pediatrician, he was carrying the child when K.M. grabbed his arm, and he pulled away from her in a "defensive move" to break her grasp. He did not push or shove her. He said K.M. then moved to the door and blocked his exit saying, "you're not leaving with him," telling her father to call the police. He recalled that after the police allowed him to leave with the child, he was later served with the TRO.

J.Z. described the parties' coparenting relationship as "[d]ifficult," claiming K.M. presents "obstacles" to his seeing their son, citing the wellness check as another example of K.M. doing anything to "get her way." He testified he needs protection from the risk of future harm by K.M. as she will "go in every avenue . . . until she gets her way." J.Z. also claimed that when he went to search for prior text message evidence on his phone, he discovered a recently

added iPhone "connected to [his] account" despite him not possessing an iPhone. Therefore, he suspected K.M. was "hack[ing]" him.

J.Z. asserted K.M. constantly belittles him as a father, calling him a "glorified babysitter," and ridiculing him for living with his parents. She questioned "how . . . [he can] call [him]self a man." J.Z. presented text messages from K.M. illustrating these comments. He recalled an incident when he came home from work and was in front of the television and K.M. started pulling wires and cables out of the television, breaking it. J.Z. denied that he ever pushed K.M. or threw a phone at her, but admitted he once punched a hole in the wall out of frustration. He recalled an incident when he "flicked" "underwear" at her, but maintained he did not do so in a threatening manner.

J.Z. presented testimony from the pediatrician's front desk assistant who was present on August 18 and recalled noting the number of family members that attended the child's visit as somewhat unusual, and then noticed they were arguing. She explained:

> When I realized there was another patient in the waiting room and the other patient was getting uncomfortable, I opened the glass door and I just said, "[w]ould you guys mind stepping out? I'm really sorry." And at that point, he was trying to leave with his son, but I think the mom and the mom's mom w[ere] kind of . . . at the door so he couldn't quite go out.

. . . .

And she just said . . . , "[h]e won't give me my son."  And he told me, "I'm trying to leave, but she won't let me."  And I . . . [said], "[w]e really don't get involved in that. . . .  [I]f you guys can just do that outside."

. . . .

And they did go outside.

J.Z. argued that the record showed K.M. committed harassment by showing up at J.Z.'s home, "trying to provoke him and press his buttons," calling for a wellness check when she "didn't get her way," trying to "rip" the child from him at the doctor, and then "blocking" him from leaving and calling the police. J.Z. claimed this conduct in the aggregate established a purpose to harass.  He also claimed the evidence supported false imprisonment,[5] and argued that his "objective fear" of K.M., her determination to go to any lengths to "get her way," and the "history of domestic violence" required the entry of a final restraining order (FRO).

K.M. countered that J.Z. did not fear her and there was no history of domestic violence by her toward J.Z.  She argued that it was defendant who

---

[5]  False imprisonment was not identified as a predicate act on J.Z.'s written complaint, but the court permitted the amendment on the record before the hearing commenced.

assaulted and harassed her, had a history of domestic violence toward her, and she reasonably feared future harm by him.

The court evaluated the evidence and dismissed the TROs against both parties. In its oral decision, the court observed, "[i]f there was one thing that was clear from the testimony of the parties it's that this was a toxic relationship that the two of them had and the toxicity seems to continue to this day." The court cited K.M.'s testimony that the two had "serious fights" and "scream[ed] at each other," to infer that acrimony came from both sides and was "back[ ]and [ ]forth between" the parties. It found that J.Z. clearly used "vulgar" and inappropriate language that "shouldn't be directed toward the mother of his child," but, as reflected in her text messages, K.M. could be "equally abusive . . . in a different way."

Regarding the August incidents, the court noted that the parties "may or may not have been on the same page" with respect to the change in the parenting time schedule and that gave rise to the disputes that followed. The court did not deem the partial recording of the scene when K.M. arrived at J.Z.'s door unannounced to be reflective of "a pattern of abusive controlling behavior," but rather, illustrative of parents "fighting over custody and . . . parenting time issues," in the absence of a formal schedule. The court found that dispute carried

over to the next day in the doctor's office.  Taken together with the history, the court characterized the parties' interaction as "domestic contretemps."

In denying K.M.'s FRO application, the court discussed the evidence in detail and did not find she established J.Z. assaulted her, noting K.M. never reported a physical assault to police, accepting J.Z.'s account that he turned away "in an attempt to shrug plaintiff's hands off of him."  Similarly, the court found K.M. did not establish that the series of events and J.Z.'s vulgar and coarse language amounted to harassment, as it was more properly deemed "a fight between the parties over custody and parenting time."

Likewise, the court denied J.Z.'s application for an FRO, finding J.Z. did not establish the predicate act of harassment.  The judge stated, "I don't find that he has established a predicate act on the grounds of harassment because, as I have spent an extensive amount of time discussing, the parties each communicated with each other very inappropriately."  The court did, however, "find that . . . [J.Z.] has established a predicate act of domestic violence on the grounds of false imprisonment in that [K.M.] conceded during her cross-examination that she blocked the exit of the doctor's office so that [J.Z.] couldn't leave."

The court nevertheless reviewed the evidence and found that J.Z. was not "in fear of [K.M.]," although it observed that "to a certain extent" the parties "intimidate each other in different ways." The court noted J.Z.'s size and "extensive martial arts experience." The court also identified "a certain element of tit-for-tat," referencing the timing of J.Z.'s later complaint. As such, the court did not find an FRO was necessary to protect J.Z. from future risk of domestic violence.

## B.

J.Z. appeals, arguing the trial court's findings were against the weight of the evidence, asserting the court erroneously relied on J.Z.'s size and martial arts experience to refute his fear of future harm. He also claims the record supported K.M.'s harassment of him, and the FRO should have been entered for his protection.

## C.

An appellate court's review of an FRO is generally limited. See C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" Ibid. (quoting J.D. v.

11

M.D.F., 207 N.J. 458, 482 (2011)); see also S.K. v. J.H., 426 N.J. Super. 230, 238 (App. Div. 2012). The appellate court may review the FRO record to determine whether the record as a whole supports issuance of the FRO. See J.D., 207 N.J. at 488.

Findings by a court "are binding on appeal when supported by adequate, substantial, credible evidence." T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). This court does not disturb a trial court's findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). By contrast, an appellate court's review of legal conclusions is de novo. See C.C., 463 N.J. Super. at 428-29.

When determining whether to issue an FRO pursuant to the Prevention of Domestic Violence Act, trial courts must engage in a two-step analysis. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). The trial court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. This determination is made "in light of

the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402). Upon a finding of a predicate act of domestic violence, the court must then determine whether an FRO is required to protect the party seeking restraints from future acts or threats of violence. Id. at 126-27. "[T]here [must] be a finding that 'relief is necessary to prevent further abuse.'" J.D., 207 N.J. at 476 (quoting N.J.S.A. 2C:25-29(b)).

## D.

First addressing J.Z.'s claim that the court erred in finding he failed to establish the critical second prong of Silver—the need for future protection— we conclude the court did not abuse its discretion. The trial court had the opportunity to observe the parties as they testified and engaged in a thorough analysis of the record and the law and found J.Z. had not established his fear of K.M. or the risk of future abuse. "[B]ecause an appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand," Balducci v. Cige, 240 N.J. 574, 595 (2020), we afford deference to that finding, which is supported by the record.

Factors to consider in determining the need for protection, though non-exhaustive, include:

(1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;

(2) The existence of immediate danger to person or property;

(3) The financial circumstances of the plaintiff and defendant;

(4) The best interests of the victim and any child;

(5) In determining custody and parenting time the protection of the victim's safety;

(6) The existence of a verifiable order of protection from another jurisdiction; and

(7) Any pattern of coercive control against a person that in purpose or effect unreasonably interferes with, threatens, or exploits a person's liberty, freedom, bodily integrity, or human rights with the court specifically considering evidence of the need for protection from immediate danger or the prevention of further abuse. . . .

[N.J.S.A. 2C:25-29(a).]

The court found that the contentious "toxic" relationship and the lack of a court-imposed parenting schedule led to the conflicts underpinning the FRO applications. The court clearly considered J.Z.'s testimony regarding K.M.'s conduct, which it recounted in its decision. Although the court noted a certain degree of mutually inflicted intimidation between the parties, albeit in different

14

forms, it found any history of K.M.'s "belittling" of J.Z. did not rise to the level of domestic violence. Although finding the relationship was harmful to the parties and potentially their child, including K.M.'s ridiculing of J.Z. as a parent, the court found these "domestic contretemps" did not warrant an FRO. We discern no basis to disturb that finding and are not persuaded the court's reference to J.Z.'s size and training as a fighter reflected the court gave improper weight to that accurate fact in considering the record in its totality.

We are similarly unpersuaded that the court abused its discretion in failing to find the predicate act of harassment, as it made specific reference to the record and found K.M.'s conduct, including her arriving at J.Z.'s parents' home unannounced and condescending statements to J.Z., to be indicative of the parties' mutually inappropriate communications over their ongoing parenting time disputes.

Although we need not substantively reach the court's finding the predicate act of false imprisonment having found no need for permanent restraints, we provide the following guidance. Here, the evidence reflects K.M., the child's parent, temporarily blocked the doorway while she summoned the police. She then moved voluntarily from the doorway when asked by the staff, and the parties proceeded outside where they each awaited the police without incident.

This did not rise to the "substantial interference with liberty" required under N.J.S.A. 2C:13-3.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1437-23