# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1586-24

N.A.B.,[1]

    Plaintiff-Respondent,

v.

W.E.,

    Defendant-Appellant.

_____

        Submitted November 18, 2025 – Decided January 30, 2026

        Before Judges DeAlmeida and Torregrossa-O'Connor.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FV-04-1389-25.

        Law Offices of Frankie Fontanez, attorneys for appellant (Zachary Hashmi, on the brief).

        Christine M. D'Elia, attorney for respondent.

PER CURIAM

---

[1] We use initials to protect the domestic violence victim's privacy. R. 1:38-3(d)(10).

Defendant W.E. appeals from the December 19, 2024 final restraining order (FRO) entered against him and in favor of plaintiff N.A.B. under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Defendant argues the trial court erred in finding plaintiff established both the predicate act of assault, N.J.S.A. 2C:12-1, and the need for permanent restraints under Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Following a review of the record and the applicable legal principles, we affirm.

I.

Plaintiff obtained a temporary restraining order (TRO) against defendant on October 24, 2024. The complaint alleged a predicate act of assault, claiming that day defendant "physically remov[ed]" plaintiff from his car, "dragged" her "on the blacktop ground," and "us[ed] his right arm to hook around the front of [her] neck," blocking her airway and obstructing her ability to breathe. The following facts are derived from the FRO hearing, during which both plaintiff and defendant testified.

Plaintiff testified she began dating defendant in January 2024. According to plaintiff, although the two did not live together, defendant spent significant

time at her home until she ended the relationship after discovering defendant's relationship with another woman,[2] on October 20.

Plaintiff explained she learned this information after defendant failed to pick her up on her birthday, October 18, for a trip they had planned. Plaintiff testified she became concerned when he did not arrive, and "called and called . . . and texted [defendant]," receiving only a single response from defendant indicating he was on the phone with his mortgage company. She described defendant as going "radio silent" as she "kept calling." Call logs and text messages admitted at the hearing showed plaintiff repeatedly attempted to contact defendant over the next few days.

Plaintiff recounted discovering two days later on defendant's phone bill an unknown number appearing as frequently as her own. Plaintiff explained she "made contact with the individual," Alice, who confirmed her relationship with defendant. Plaintiff then ended her relationship with defendant.

Plaintiff testified, on October 21, she went to Alice's home to retrieve "[her] car keys and [shoes]" because she left those items in defendant's car and

---

[2]  To protect confidentiality, we use the fictitious name Alice when referring to this individual.  Although the testimony is unclear as to the precise status of her relationship with defendant, the parties occasionally reference Alice as defendant's "fiancé."

A-1586-24

he never returned on her birthday weekend. Plaintiff indicated defendant later came to her house to return her belongings and retrieve his Wi-Fi box. Once there, defendant gave plaintiff her shoes and keys, but plaintiff did not give defendant the Wi-Fi box because she was on a work call and believed he wanted to impede her ability to work.

Plaintiff testified she next saw defendant driving on October 24. She explained that she was returning from "[defendant's] brother's office," because she was trying to return the Wi-Fi box "to [defendant's] brother, but his brother was not there and [she] didn't want to leave it with some stranger." Specifically, while driving, plaintiff "look[ed] to [her] left" and saw defendant in the car next to her. Plaintiff explained that "[they] got to one of the lights and [defendant] signaled [her] . . . telling [her] to pull over."

Plaintiff stated she and defendant parked beside each other at "Ferry Station." According to plaintiff, "[they] both started getting out of the car" and defendant said, "leave your phone." When plaintiff asked why, defendant responded "because I don't trust you." According to plaintiff, she responded, "you're the person who can't be trusted because you're the one who's engaged, you've been engaged and lying this whole time."

A-1586-24

Plaintiff also testified that she began recording the interaction on her phone. They stood in front of their cars "having an argument," and defendant became "[i]rate." During this exchange, plaintiff asked defendant if he was engaged. Plaintiff testified when defendant denied the relationship she said, "let's call [Alice]" and "proceeded to call her" until "[defendant] snatched [her] telephone from [her]." Plaintiff started yelling "give me back my phone." As she headed back to her car, she "s[aw] that [defendant's] phone [wa]s on the floor . . . of his car" and "grabbed" it. Plaintiff admitted at some point she was in defendant's car.

Plaintiff testified she got back to her car and defendant "started running over to [her]" and she tried to start her car "so [she] could get away." She recounted "[defendant] reache[d] in . . . put[] his arm around [her] neck and start[ed] choking [her]." Plaintiff clarified that defendant's arm was "touching" her neck and that "[she] was gasping" and "could not breath[e]." Plaintiff said that she started beeping her car's horn "so that anybody that was around could hear me."

As a result, plaintiff indicated defendant "t[ook] his arm[] off [her] neck" and "snatched [her] keys." She described the two "tr[ied] to give each other the phone like at the same time," but defendant "just snatched his phone and then

5

started walking off with [her] phone." Plaintiff yelled, demanding defendant return her phone and keys, and defendant "thr[ew her] phone and it . . . ended up landing inside of [her] car." After retrieving her phone, plaintiff said she stopped the recording that was running on her phone and "called 911."

Plaintiff explained her leg was injured during the encounter.[3] Specifically, she stated "when [defendant] was choking [her] . . . . [She] fell out [of] the car" because defendant was "pulling" her. Plaintiff said that the resulting injury to her ankle "was awful swollen" and she was "limping the whole time" when she arrived at the police station. Plaintiff also testified that, although there weren't any marks on her neck, "[her] throat was sore for a few days."

Plaintiff played the audio recording of the incident, which, although unintelligible at times, reflected a heated encounter and the parties arguing. In part, the recording captured defendant calling plaintiff a "f[***]ing liar," and plaintiff calling defendant a liar as he denied her accusations. Plaintiff at one point stated, "let's call her," and defendant responded, "see you later" and "don't

---

[3] Photographs of plaintiff's injuries were admitted into evidence and included in her appendix on appeal.

get in my car." The recording contained non-verbal sounds, including plaintiff yelling and crying, and a car horn honking. Police then arrived at the scene.

Plaintiff testified defendant worked as a toll taker, sometimes on the Ben Franklin Bridge, which she crosses "Monday through Friday" for work; she does not have an E-ZPass. She said she encountered defendant at the toll booth two weeks before the hearing without incident, and defendant clearly knew her car because he helped her purchase it. According to plaintiff, during their relationship, plaintiff walked the bridge daily for exercise, and defendant photographed her car in the parking lot and "sent it to[her] while [she] was walking." She indicated, "he watches [her]."

Plaintiff explained her fear of defendant since the assault. She feared he would harass or hurt her, as he knew her address and where she works, her apartment security code, and her family members. She noted she is missing her car's remote starter but has at times found her car running outside her house.

Defendant testified plaintiff initiated the October 24 contact when she "signal[ed] to [him] to pull over," and "[he] didn't even respond to her." Defendant also explained that, after plaintiff "pulled right beside [him]" at Ferry Station, "[plaintiff] took [his] phone first when she reached in [his] car." Defendant claimed he was trying to drive away from the situation, and "[plaintiff

7

tried] to get in [his] car again" as he "pulled off." Defendant explained that "[he] was on the phone with the police at that time . . . driving with [his] door open and everything." Defendant suspected that plaintiff sustained injuries to her ankle "when she fell out of [his] car trying to get back in it the second time."

Defendant denied ever choking plaintiff and stated he had no interest in a relationship with her. He described their earlier relationship as a friendship, although admitting it was also sexual. He testified he had no intention of contacting plaintiff in the future, and there was no need for a restraining order.

In summation, defendant's counsel argued plaintiff was not credible, as the parties' relationship was over when plaintiff called and texted defendant repeatedly, and defendant did not wish to communicate with her. The court interjected "[t]he failure to respond to 80 text communications is annoying conduct on . . . defendant's part." The court indicated it "[did not] know why he would not do that. Sometimes you . . . text repeatedly because you're concerned is the person dead, did they get in a horrible car accident. That is appropriate communication."

Plaintiff's counsel argued defendant's conduct in assaulting and choking plaintiff was "egregious" and warranted imposition of a restraining order.

 A-1586-24

The court then rendered oral findings and granted permanent restraints. The court, having heard and observed both parties testify, found plaintiff "[wa]s a much more credible witness." The court credited plaintiff's testimony and found she established a predicate act of assault after an "altercation" on October 24. It found defendant "t[ook] plaintiff's phone first," and stated, "[i]t [was] . . . plaintiff who's then pursued by . . . defendant. . . . I'm not sure exactly why she winds up in . . . defendant's car, but she's in . . . defendant's car." The court noted plaintiff recorded the "melee," which confirmed "the altercation."

The trial court continued, "I'm satisfied . . . defendant thought he had the right to choke . . . plaintiff to get her out of his car. He . . . does not. I'm satisfied that he choked . . . plaintiff. I'm satisfied that is a clear assault under [N.J.S.A.] 2C:12-1 and that is much more egregious than necessary." The court concluded defendant's conduct constituted an "egregious act of domestic violence."

Regarding the need for a restraining order, the court noted the parties remained in proximity to each other as plaintiff travelled "across the bridge every day . . . and runs into [defendant] paying a toll." The court also focused on defendant's behavior surrounding the assault, in particular defendant's "ignoring" plaintiff's telephone calls and attempts to reach him. It noted

A-1586-24

"[n]ormally that is annoying conduct on . . . plaintiff's part, but we don't have a restraining order, a violation or a TRO filed by the defendant against . . . plaintiff." However, in these circumstances, the court found defendant's behavior "egregious" and "cruel," namely, his disappearing on her birthday, keeping "secret" his relationship with Alice, and deliberately refusing to contact plaintiff to explain or allay her concerns for his welfare. Finally, the court found plaintiff in "need of protection," as "there's going to be continuing connection and . . . defendant needs to do something with his job to avoid the contact."

At the conclusion of the trial, the trial court issued an FRO against defendant. The restraints included prohibiting defendant from working at the Ben Franklin Bridge location, although it noted it would reconsider this restriction in the future if it "becomes an impossibility."

II.

Defendant appeals and argues the court erred in (1) finding plaintiff established the predicate act of assault, (2) either finding a predicate act of harassment or "giving some quantum of weight" to defendant's failure to answer plaintiff's phone calls, and (3) issuing an FRO because plaintiff did not show defendant's conduct was egregious and a pattern of controlling behavior.

10

A-1586-24

A.

An appellate court's review of an FRO is generally limited.  See C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020).  "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'"  Ibid. (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)); see also S.K. v. J.H., 426 N.J. Super. 230, 238 (App. Div. 2012) (citing Cesare v. Cesare, 154 N.J. 394, 411-13 (1998)).  "Appellate courts owe deference to the trial court's credibility determinations as well because it has 'a better perspective than a reviewing court in evaluating the veracity of a witness.'"  C.R. v. M.T., 248 N.J. 428, 440 (2021) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)).

Findings by a trial court "are binding on appeal when supported by adequate, substantial, credible evidence."  T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017) (quoting Cesare, 154 N.J. at 411-12).  We do not disturb a court's findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice."  Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).  Further, we may

review the FRO record to determine whether the record as a whole supports issuance of the FRO. See J.D., 207 N.J. at 484-85. Legal conclusions are reviewed de novo. C.C., 463 N.J. Super. at 428-29 (citing Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007)).

When determining whether to issue an FRO pursuant to the PDVA, trial courts must engage in a two-step analysis. See Silver, 387 N.J. Super. at 125-27. The court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. Upon finding a predicate act of domestic violence, the court must then determine whether an FRO is required to protect the party seeking restraints from future acts or threats of violence. Id. at 126-27. "[T]here [must] be a finding that 'relief is necessary to prevent further abuse.'" J.D., 207 N.J. at 476 (quoting N.J.S.A. 2C:25-29(b)).

B.

We first address defendant's challenge to the trial court's finding defendant committed the predicate act of assault. N.J.S.A. 2C:12-1(a)(1) provides in relevant part that a person commits simple assault by either "attempt[ing] to cause or purposely, knowingly or recklessly caus[ing] bodily injury to another."

12

We have reviewed the record and conclude the trial court did not misapply its discretion in finding plaintiff established defendant committed the predicate act of assault. Here, the court, after observing both parties testify and listening to the recording of the encounter, found plaintiff's testimony more credible than defendant's. Plaintiff testified she uncovered defendant's secreted relationship after defendant failed to arrive as scheduled for a preplanned birthday trip, stopped all communications, and failed to respond to plaintiff's communications. She indicated she contacted Alice, clearly placing defendant on notice plaintiff discovered his hidden relationship, which angered defendant.

After a limited contact between the parties to exchange and return property, according to plaintiff, she saw defendant while driving, who signaled her to pull over. They argued, she threatened to call Alice, and defendant grabbed her phone. Plaintiff conceded she at one point got into defendant's car and took his phone. Plaintiff testified defendant physically grabbed her, and choked her by closing his arm around her neck, blocking her airway, and stopped only when she sounded the car's horn. She also testified that defendant dragged her out of the car, causing an injury to her leg. Photos corroborated that injury. Because the court credited plaintiff's testimony over defendant's, we are satisfied

13

the record as a whole supports the court's finding "[defendant] reache[d] in . . . put[] his arm around [her] neck and start[ed] choking [her]."

Defendant cites the court's finding defendant choked plaintiff "to get her out of his car," as inconsistent with plaintiff's testimony she was choked trying to start her car. We are not persuaded any divergence undermines plaintiff's credibility or the finding an assault occurred. The fluidity of the parties' encounter throughout the scene is clear from the testimony of both plaintiff and defendant, and the recording. The parties moved from their respective cars to the area in front of both, to defendant's car, and to plaintiff's car in some sequence. Further, we are satisfied the record supports the court's finding defendant choked plaintiff by putting his arm around her neck.

We note, as did the trial court, the audio captured the encounter and supported plaintiff's testimony in vital respects. The recording captured plaintiff again confronting defendant about his deception, attempting to contact Alice, screaming and crying in a manner consistent with fear and distress, and a horn honking.

In light of the high deference that we afford a trial court's findings of fact, and because we review the record as a whole when reviewing FRO

14

determinations, we discern no reason to disturb the court's finding that defendant assaulted plaintiff as a predicate act under N.J.S.A. 2C:25-19.

We next address and reject defendant's argument the court improperly found his failure to answer plaintiff's repeated calls and texts was a separate and egregious predicate act among "several predicate acts." Although the court referenced defendant's ignoring plaintiff as "egregious," we are unpersuaded it ultimately found a predicate act of harassment in entering the FRO. Any reference by the court to the events leading up to the physical encounter served merely to contextualize the assault in considering the necessity of permanent restraints. The court made no independent finding defendant committed harassment in reaching its decision.

The trial court also found an FRO was necessary to protect plaintiff under prong two of Silver. We recognize the record reflects no history of domestic violence involving the parties. However, in these circumstances, we also conclude the court did not err in granting permanent restraints.

Determinations regarding the necessity of an FRO are based on a totality of the circumstances analysis. C.C., 463 N.J. Super. at 436; see also N.J.S.A. 2C:25-29. Significantly, however, "[w]hen the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue

15

an FRO 'is most often perfunctory and self-evident.'" A.M.C. v. P.B., 447 N.J. Super. 402, 414-17 (App. Div. 2016) (quoting Silver, 387 N.J. Super. at 122-25, 127-28) ("[A] factor that consistently appeared in most of the cases that upheld the denial of restraints [was that] the predicate act did not involve physical violence."). This is particularly true when the act is sufficiently "egregious." Silver, 387 N.J. Super. at 123.

Here, we are satisfied the court found defendant's conduct constituted a particularly egregious assault, giving rise to concerns of future domestic violence. This finding was supported by plaintiff's testimony defendant grabbed her phone and choked her, restricting her ability to breathe, until she honked the car's horn causing him to release his grip, throw her phone, and retreat. We see no error in the court's finding defendant felt "entitled" to choke plaintiff to get her out of his car, which is consistent with the record that also supports his doing so to stop plaintiff's attempts to again call Alice.

We do not view the court's comments concerning defendant's failure to respond to plaintiff's repeated messages and calls, or its references to defendant's concealed relationship with Alice, as improper when placed in context. Instead, the court referenced these circumstances to emphasize the seriousness of the assault. The record supported the conclusion defendant, irate at plaintiff's

16

exposing his dual relationships, attacked plaintiff by dragging and choking her to prevent her from calling Alice. The court fairly noted a particular "cruelty" in defendant's failure to respond to plaintiff's calls, his failure to appear on plaintiff's birthday, and uncharacteristically ceasing contact without explanation. The court noted concern in what it characterized as defendant's sense of entitlement to physically attack plaintiff. These observations were reasonable in assessing the totality of the circumstances.

Against that backdrop, the court then found the egregious assault warranted concern for plaintiff's future safety, particularly as it found defendant knew the details of plaintiff's residence, work, daily routine, security codes, and family. The court noted defendant's employment as a toll-booth operator, at times on the bridge plaintiff crosses every day for work, places them in continued proximity, heightening the risk of future harm. We therefore conclude the court properly exercised its discretion in entering permanent restraints.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

17